IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| JERRY VALENTINE, JR, | ) | CASE NO. 1:18CV1887 |
| | ) | |
| Plaintiff, | ) | |
| | ) | JUDGE JAMES S. GWIN |
| v. | ) | |
| | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

Plaintiff Jerry Valentine, Jr ("Valentine") seeks judicial review of the final decision of

Defendant Commissioner of Social Security ("Commissioner") denying his application for

Supplemental Security Income ("SSI").  Doc. 1.  This Court has jurisdiction pursuant to 42

U.S.C. § 405(g).  This matter has been referred to the undersigned Magistrate Judge for a Report

and Recommendation pursuant to Local Rule 72.2(b)(1).

For the reasons stated below, the undersigned recommends that the Commissioner's

decision be **AFFIRMED**.

## I. Procedural History

On August 9, 2015, Valentine filed an application for SSI, alleging a disability onset date

of April 30, 2010.  Tr. 39, 255.  He alleged disability based on the following: torn meniscus left

knee and cellulitis with arthritis, PTSD, depression, anxiety, and arthritis throughout his joints.

Tr. 286.  After denials by the state agency initially (Tr. 149) and on reconsideration (Tr. 165),

Valentine requested an administrative hearing.  Tr. 185.  A hearing was held before an

Administrative Law Judge ("ALJ") on August 28, 2017.  Tr. 59-210.  In her February 6, 2018,

decision (Tr. 39-53), the ALJ determined that there are jobs that exist in the national economy

that Valentine can perform, i.e., he is not disabled.  Tr. 52-53.  The Appeals Council denied

Valentine's request for review, making the ALJ's decision the final decision of the

Commissioner.  Tr. 1-3.

## II. Evidence

### A.  Personal and Vocational Evidence

Valentine was born in 1971 and was 43 years old on the date he filed his application.  Tr.

52.  He previously performed work as a service station attendant.  Tr. 87.  He has a tenth grade

education and was in special ed classes.  Tr. 86.

### B.  Relevant Medical Evidence

In July 2013, while in prison, Valentine complained of left knee pain.  Tr. 371.

On August 1, 2013, J. Bell, M.D., examined Valentine in prison and made three findings.

First, Dr. Bell provided medical restrictions (limited to lifting no more than 10 pounds and no

standing more than 5-10 minutes), indicated that Valentine needs a cane, and provided him with

a sleeve for his left knee, all due to Valentine's past meniscus surgery and arthritis.  Tr. 361.  His

cane was for "left knee support" and the restrictions were to last one year.  Tr. 347.  Second, Dr.

Bell recommended a podiatry appointment due to swelling in Valentine's feet.  Tr. 361.  Third,

he recommended that Valentine's medical records regarding his chronic, severe varicose veins in

his bilateral legs be obtained.  Tr. 361.  In Valentine's prison medical chart, Dr. Bell stated that

Valentine has significant varicosity in both legs, which leads to a gait issue, and that he needed a

cane.  Tr. 371.  Dr. Bell thereafter reviewed Valentine's records and described Valentine's

varicosity as very severe, and observed that Valentine's mother had this condition and had had

surgery for it.  Tr. 371.

In September 2013, Valentine was prescribed compression stockings.  Tr. 372.

Valentine was released from prison in November 2014 and his medical summary listed his restrictions: low bunk, cane to ambulate, lifting no more than 10 pounds, and no standing more than 30 minutes.  Tr. 343.

On December 17, 2014, Valentine visited Frontline Services for a mental health assessment.  Tr. 405.  His chief complaint was "I need help and I am trying to get SSI."  Tr. 414. He walked with a cane and limped.  Tr. 415.  He was taking medication that he had been on in prison, including Celexa and Trazodone.  Tr. 415.  The practical nurse who assessed him opined that Valentine seemed focused on impressing the nurse that his symptoms were severe and significant and he seemed rehearsed and extremely dramatic.  Tr. 415.  His medications were adjusted.  Tr. 415.

On January 14, 2015, Valentine returned to Frontline.  Tr. 419.  He reported that he had a little calmness during the day but that it wore off towards evening.  Tr. 420.  Upon exam, he was aggressive, agitated, and demanding, had pressured speech, and his mood was "I'm upset, I am confused and I am angry."  Tr. 419.  His thought process was organized, his judgment mildly impaired, and his insight absent.  Tr. 419.  His medications were adjusted.  Tr. 420.

On March 31, 2015, Valentine saw Alaa Addasi, M.D. and/or Gabriel Crowl, M.D., at MetroHealth for a follow up for his varicose veins in both legs.  Tr. 450.  He had previously seen another doctor until 2012, when he was incarcerated, and presented to MetroHealth for treatment since his release.  Tr. 450.  Valentine reported that he had been wearing compression stockings without relief and was currently wearing them intermittently.  Tr. 450.  He complained of numbness and tingling in both legs and reported bleeding from varicosities in his left ankle within the last month.  Tr. 450.  He also complained of testicular swelling and blood in his semen due to venous reflux.  Tr. 450.  Upon exam, he had large varicosities in the medial aspects of

both legs from his groin to his ankles, left greater than right, and scabs at his left ankle.  Tr. 451. The doctor ordered a new venous insufficiency duplex study, prescribed compression hose that Valentine should wear "all the time," and recommended "elevation, compression, reduce time spent standing up."  Tr. 450.  Daily walking was recommended.  Tr. 450.

On June 9, 2015, Valentine returned to Dr. Addasi for a follow up of his testing.  Tr. 469. He reported no improvement wearing elastic support stockings.  Tr. 469.  Upon exam, he had prominent varicose veins in both legs, no venous ulceration, and areas of pre-ulceration on his left ankle area with very superficial varix.  Tr. 471.  Dr. Addasi reviewed Valentine's venous insufficiency duplex study as showing no deep vein thrombosis and pathological reflux in the great saphenous vein (GSV) bilaterally.  Tr. 471.  Dr. Addasi diagnosed bilateral leg GSV distribution varicose veins.  Tr. 471.  He recommended that Valentine wear support stockings during waking hours, elevate his legs, and avoid prolonged standing.  Tr. 471.  He also scheduled him for a left GSV radiofrequency ablation.  Tr. 471.

On June 15, 2015, Valentine saw Irma Lengu, M.D., at the urology department at MetroHealth for blood in his semen and reported varicose veins in his scrotum.  Tr. 466.  Upon exam, he had a normal gait and he was not deemed at risk for falls.  Tr. 466-467.  He was diagnosed with varicocele, prescribed antibiotics and Motrin, and ordered to follow up in 6 weeks.  Tr. 468.

On June 30, 2015, an x-ray of Valentine's left knee showed narrowing of the femoral patellar compartment and the medial femorotibial compartment.  Tr. 479.  The impression was no evidence of fracture or dislocation and degenerative changes.  Tr. 479.

On June 15, 2016, Valentine went to the emergency room at MetroHealth complaining of "multiple symptoms and concerns including lack of current [primary care physician] for

maintenance care and medication." Tr. 495.  He reported pain in his right calf for four days:

warmth, redness, and pain with weight-bearing that radiated upwards to his right buttock.  Tr.

495.  He stated that he had a job as a mechanic in a car shop.  Tr. 495.  He was diagnosed with

soft tissue cellulitis (infection) and varicose veins in both legs.  Tr. 496.  Preliminary radiologic

results did not show deep vein thrombosis (DVT).  Tr. 496.  He was prescribed antibiotics and

discharged as stable with instructions to continue his regular medications, wear compression

socks, elevate his legs when at rest, and have a repeat ultrasound to check for DVT in a week.

Tr. 496.

On February 16, 2017, Valentine went to the emergency room at MetroHealth with a rash

on his torso and reported missing work every day that week from the pain.  Tr. 543, 546.  Upon

exam, he appeared pleasant and had a normal range of motion in his legs and a normal gait.  Tr.

545.

On August 8, 2017, Valentine saw licensed social worker James Wolen at Connections

for a mental health assessment.  Tr. 644-654.  He reported that he and his girlfriend were renting

an apartment and had a good relationship.  Tr. 644-645.  He saw his daughters and grandson

regularly and his mother twice a month.  Tr. 644.  He reported having friends, including his ex-

boss with whom he would go on weekend trips to Kelley's Island.  Tr. 645.  He volunteered at a

food bank passing out food.  Tr. 645.  He reported working a part-time job (mechanic, odd jobs)

with good performance and normal attendance.  Tr. 645-646.  He stated that he needed to be at a

distance from others at work because "he put his hands on other employees."  Tr. 645.  He

alleged having one angry outburst per week.  Tr. 649.  He did not get on crowded buses and left

stores when they got too crowded.  Tr. 649.  He reported that he had wrecked a food store and

had been banned from it.  Tr. 648.  He could not tolerate theaters or certain restaurants that were

too crowded.  Tr. 649.  He was noted to favor one leg when walking and there was no mention of

him using a cane.  Tr. 651.  He reported that he had bereavement issues due to grieving over

others who had died over the years, anxiety, traumatic stress, anger/aggression, oppositional

behaviors, disturbed reality, mood swings, and sleep problems.  Tr. 649-650.  He reported being

treated for PTSD, personality disorder, and depression in the past.  Tr. 652.  He was diagnosed

with PTSD, antisocial personality disorder and agoraphobia.  Tr. 653.  He was referred for

psychiatry and counseling.  Tr. 653.

### C. Opinion Evidence

#### 1. Consultative Examiner

On June 27, 2015, Valentine saw Patrick Marinello, M.D., for a consultative

examination.  Tr. 474-478.  He reported "left knee problems since 1999 secondary to a work

related injury where he tore his left meniscus."  Tr. 474.  He had had surgery in 2000.  Tr. 474.

He had pain, stiffness, and heat in his knee, 8/10 most days but 5/10 on the examination date.  Tr.

474.  He felt like his knee was unsteady and dislocating.  Tr. 477.  His pain increased with rain,

twisting, prolonged standing and walking, and was relieved by ice and elevating his legs.  Tr.

474.  He reported that, due to knee pain, he was limited to sitting 10 minutes, standing/walking

20-30 minutes, and lifting and carrying 30 pounds occasionally.  Tr. 475.  He occasionally sees a

doctor for the problem and has been told he has arthritis.  Tr. 478.  He stated that he has been

unemployed and out of work since 2007.  Tr. 475.  A typical day consisted of "taking care of his

mother and doing things around the house."  Tr. 475.

Upon exam, he had good eye contact, fluid speech, normal memory, an appropriate

mood, and he was cooperative.  Tr. 476-477.  He had a slow and unsteady gait; he had a cane and

was not able to walk around the examination room without it.  Tr. 477.  He was able to rise from

a sitting position without difficulty, had no difficulty getting on and off the exam table, could squat and rise up with moderate difficulty, could not heel and toe walk, his tandem walk was abnormal, and he could stand, but not hop, on one foot.  Tr. 477.  He had normal sensation and reflexes.  Tr. 476.  He had tenderness to palpation on his left knee and effusion and swelling.  Tr. 476.  On manual muscle testing, he had full strength in his legs and reduced flexion in his left knee.  Tr. 481, 484.  He had significant varicose veins on both legs.  Tr. 478.  He wore compression stockings and had a brace on his left knee.  Tr. 478.

Dr. Marinello opined that Valentine's condition appeared to be relatively stable, he has been dealing with it for a long time, and it seemed like a potentially treatable condition.  Tr. 478.  He advised Valentine follow up with orthopedics at MetroHealth.  Tr. 478.  Dr. Marinello opined that Valentine could "sit and stand normally in an 8-hour workday with normal breaks."  Tr. 478.  He had moderate limitations with walking due to knee pain and needed a cane to walk short and long distances and on uneven terrain.  Tr. 478.  Due to knee pain, he had moderate limitations lifting and carrying, he could bend and stoop frequently, and he could crouch and squat occasionally.  Tr. 478.  He had "no relevant communicative or work place environmental limitations."  Tr. 478.

On June 30, 2015, Valentine saw Mitchell Wax, Ph.D., for a psychological exam.  Tr. 487-492.  He reported having contact daily with his 22-year-old daughter.  Tr. 488.  He said he earned money doing odd jobs involving cars but would not provide clear information on how much money he made.  Tr. 488.  Three times a week people would call him and he would perform car repairs, putting in an alternator belt or a battery.  Tr. 489.  His last regular job was in 2005 at an automotive shop doing repairs.  Tr. 489.  Dr. Wax stated that, when he asked Valentine what he did in a typical day, Valentine would not provide clear information; "He kept

changing stories of what he does." Tr. 489.  He was often out and about with his daughters, or fixing cars for friends, or going to doctor appointments, and his ex-mother-in-law drove him places.  Tr. 488.  He goes grocery shopping once a week, sometimes watches up to 10 hours of television a day, and he builds model cars.  Tr. 489.  He talks to two friends daily and his brothers three times a week.  Tr. 489.  He sees his elder daughter daily and he lives with his mother.  Tr. 489.  He had recently started dating a woman he met at a friend's cookout two days prior.  Tr. 489.  He cooks by using a microwave; otherwise his daughter will cook something for him and his mother does dishes.  Tr. 489.  He did not do laundry because its hard for him to do stairs.  Tr. 489.  His daughter cleans the house.  Tr. 489.

Valentine stated that he was unable to work a regular job because he doesn't get along with people, and if somebody were to say the wrong thing or touch him the wrong way he'll put his hands on them; he loses control fast.  Tr. 491.  "I'm afraid I'm going to snap and I can't control myself."  Tr. 490.  He also stated that he was able to control himself and has not been in a fight since 2009, when he tried to kill his cellmate in prison and, at which time, he was put on medication.  Tr. 490, 491.  Dr. Wax observed that, throughout the interview, Valentine was intense, easily agitated and hyper alert; when agitated, he had mental confusion.  Tr. 490.

Dr. Wax diagnosed bipolar disorder and a personality disorder with antisocial features. Tr. 491.  He concluded that Valentine would not respond appropriately to supervisors and coworkers or work pressures in a work setting.  Tr. 492.  He would be able to understand, remember and carry out instructions and would have difficulty maintaining attention and concentration on a job.  Tr. 492.

### 2. State Agency Reviewers

On July 28, 2015, state agency reviewing physician Stephen Sutherland, M.D., reviewed

Valentine's record and opined that he could perform light work, stand for four hours, sit for six hours, and he had postural limitations and environmental restrictions.  Tr. 141-143.  He found that there was no evidence in the medical record to indicate that a cane was required at the most recent office visits.  Tr. 143.  On December 27, 2015, state agency reviewing physician Steve McKee, M.D., affirmed Dr. Sutherland's opinion.  Tr. 158-160.

On August 25, 2015, state agency reviewer Courtney Zeune, PsyD, reviewed Valentine's record and opined that he could perform tasks that can be completed independent of others in a stable setting with clear predictable expectations; changes in routines should be infrequent and implemented with advanced notice; and he could interact with others on a brief, intermittent superficial basis without expectations to engage in collaborative tasks or frequent tasks with the general public.  Tr. 144-146.  On December 28, 2015, state agency reviewer Joseph Edwards, Ph.D., adopted Dr. Zeune's opinion.  Tr. 160-162.

### D.  Testimonial Evidence

#### 1.  Valentine's Testimony

Valentine was represented by counsel and testified at the administrative hearing.  Tr. 61. He lives in an apartment with his girlfriend; the apartment has three steps.  Tr. 81.  He works part time at an auto body repair shop.  Tr. 63.  He got the job because he is friends with his employer, whom he has known for 25 years.  Tr. 63-64.  At work, he sits at a bench and takes apart transmissions for scrap.  Tr. 64.  He has a bucket underneath his desk that he props his leg up on. Tr. 65.  Previously, he worked for this same friend full time, changing tires, repairing brakes, and doing oil changes.  Tr. 66.  He decides how many hours a week he works; he can't work more than five hours a day "because after that it's all bad for me."  Tr. 83.  He can work three days in a row, but afterwards his legs have to recover and he cannot work for two days.  Tr. 83.  He is

alright if he works every other day.  Tr. 83.  While at work, he has no interactions with others

and just deals with his boss.  Tr. 85.  He works in his own little area and no one comes there.  Tr.

85.  His boss knows that, in the past, Valentine would put his hands on employees and lash out.

Tr. 85.

  At most, Valentine can sit for a half-hour at a time and then he needs to move around for

10-20 minutes before sitting back down again.  Tr. 84.  When he is at home, he spends most of

his time in a recliner with his leg elevated above his heart.  Tr. 84.  When he sleeps, he places his

leg on a pillow so it is higher than his heart.  Tr. 84.  He wears his compression stockings a

couple of hours a night, but he can't sleep with them.  Tr. 84.  When he is home and not walking

around, he takes his leg brace off and puts the stockings on to take the swelling down.  Tr. 84.

  Previously, Valentine was homeless and was sleeping in his car, so he could not work.

Tr. 65.  Every time he worked somewhere he would get in trouble or "put my hands on them."

Tr. 65.  He does not want to go back to prison.  Tr. 65.  When he was in prison he choked his

cellmate so now, if he goes to prison, they put him in a single cell.  Tr. 65.  Or, "six cop cars

show up because they're saying I'm violent or something or uncontrollable.  But long as I'm

taking my meds, I'm okay a little bit."  Tr. 65.  He manages certain things with his medication.

Tr. 65.  He has been dealing with it since 2009 and he finally got on mediation and started

getting some help here and there; "talking to counselors and psychiatrists is how I ha[ve] been

able to adapt in situations."  Tr. 66.  He ignored it for so long, and now it is getting worse.  Tr.

85.

  Valentine has also "been dealing with this leg problem on this left leg for 20 years."  Tr.

67.  At the hearing, for his leg discomfort, Valentine used a chair to elevate his leg, a cane, and a

brace.  Tr. 67.  He can't wear his compression stockings when he has his brace on his leg

because it gives him a rash.  Tr. 67.  He has to "compensate everyday: the brace or the stockings."  Tr. 67.  But he always has to keep the cane, which he has had since 2009.  Tr. 67-68. When asked why he was elevating his leg during the hearing, Valentine answered that, if he has to sit for 15-20 minutes, his foot starts tingling and when he tries to stand up he will fall and bump his head.  Tr. 68.  He has had to switch his bed around so he can get up using his right leg instead of his left, so he doesn't injure himself.  Tr. 68.  The last time he fell, he was getting out of bed at 3 o'clock in the morning and his leg gave out with no warning and he hit his head on the dresser.  Tr. 70.  He has good days and bad days but more bad than good.  Tr. 68.  He uses his cane around his house.  Tr. 68.  He no longer drives a car because his feet fall asleep.  Tr. 68. He cannot walk through a grocery store because he can't deal with the close quarters and the people in the checkout line; he has left the store many times for that reason and has gotten into a fight at one store and is now barred from that store.  Tr. 69.  He also stated that he gets a cart at the store because his feet fall asleep and there is nowhere in the grocery store to elevate his foot. Tr. 69.  He can walk short distances but he can't go up and down "all the [ais]les" looking for what he needs.  Tr. 69.  That is why he sends someone to go for him.  Tr. 70.  Plus, he has a hard time reading and writing.  Tr. 70.

Currently, Valentine is taking Motrin and baby aspirins for his legs, to keep the pain and the swelling down.  Tr. 70.  The aspirin is to prevent blood clots.  Tr. 70.  To use stairs, he has to go sideways or, if there is more than four stairs, he has to go sideways and put his hand on the wall.  Tr. 71.  He has been adapting to this for years.  Tr. 71.  He still uses public transportation. Tr. 71.  He has a disability pass from the bus company.  Tr. 71.  He has difficulty accessing the bus because certain ones have a certain number of stairs and, if it's crowded, he can't ride

because his PTSD causes him to get irritated, his anxiety kicks in, and he feels like someone is after him or touching him.  Tr. 71-72.

Recently, Valentine has gone back to Connections for mental health treatment.  Tr. 72. He was prompted to do so because he had gone to a couple different places, like Resource Recovery, but they were not feasible for him.  Tr. 72.  He felt that they were not understanding his problem; they were addressing him as "another person just, like, off the street," and they took him off his medication.  Tr. 72.  They were putting him on "little, off-the-wall medication I never took," but you cannot just take someone off all their medication that they have been taking for years.  Tr. 79.  He told them that he has been on his medication since 2009 and there was no way he was going to change it; they wouldn't listen to him, however, so that's why he went back to Connections.  Tr. 72.  At Connections, they talk to him and he gets the right medication that he needs, that works for him.  Tr. 72.  Currently, he is taking Depakote and Celexa.  Tr. 72.  The medication keeps him somewhat stable where he can function in society without hurting himself or others.  Tr. 79.  "But I'm getting a little bit irritated right now."  Tr. 72-73.  Also, at Resource Recovery, they put him in a group session but he "wasn't feeling it."  Tr. 79.  His mental health symptoms include irritation, anxiety, rapid thoughts, being in fear that someone is behind him, and hearing people giggling and laughing all day long.  Tr. 85.  For instance, at the hearing, "there's a talk show on, giggling."  Tr. 85.  He gets irritated by his rapid thoughts; what is in his head doesn't make it down to his mouth fast enough.  Tr. 86.  This has been happening daily for the last fifteen years.  Tr. 86.

### 2.  Vocational Expert's Testimony

A Vocational Expert ("VE") also testified at the hearing.  Tr. 86-95.  The ALJ asked the VE to determine whether a hypothetical individual of Valentine's age, education and work

experience could perform Valentine's past work or any other work if that person had the limitations assessed in the ALJ's RFC determination, and the VE answered that such an individual could not perform Valentine's past work but could perform other jobs with significant numbers in the national economy such as packer, garment sorter, and mail room clerk.  Tr. 87.

### III. Standard for Disability

Under the Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1. If claimant is doing substantial gainful activity, he is not disabled.

2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to

determine if claimant's impairment prevents him from doing past relevant work.  If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.      If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920;[1] *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).

Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.

*Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the

Commissioner at Step Five to establish whether the claimant has the vocational factors to

perform work available in the national economy.  *Id.*

### IV. The ALJ's Decision

In her February 6, 2018, decision, the ALJ made the following findings:

1.      The claimant has not engaged in substantial gainful activity since April 9, 2015, the application date.  Tr. 42.

2.      The claimant has the following severe impairments: torn meniscus of the left knee, osteoarthritis in the left knee (narrowing and degeneration), varicose veins, obesity, post traumatic stress disorder, depression, and anxiety.  Tr. 42.

3.      The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.  Tr. 42.

4.      The claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) except the claimant can stand or walk for four hours; can occasionally use pedals with left leg; can never climb ladders, ropes, or scaffolds; can frequently climb ramps and stairs; can frequently stoop; can occasionally kneel, crouch and crawl; must avoid concentrated exposure to vibration and working in unprotected heights;

---

[1] The DIB and SSI regulations cited herein are generally identical.  Accordingly, for convenience, further citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 et seq.  The analogous SSI regulations are found at 20 C.F.R. § 416.901 et seq., corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds to 20 C.F.R. § 416.920).

can perform simple, routine-type work without strict production quotas for time or quantity; is limited to superficial interactions with others defined as speaking, signaling, asking questions, and serving but no arbitration or conflict resolution.  Tr. 44.

5.      The claimant has no past relevant work.  Tr. 52.

6.      The claimant was born in 1971 and was 43 years old, which is defined as a younger individual age 18-49, on the date the application was filed.  Tr. 52.

7.      The claimant has a limited education and is able to communicate in English.  Tr. 52.

8.      Transferability of job skills is not an issue because the claimant does not have past relevant work.  Tr. 52.

9.      Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform.  Tr. 52.

10.     The claimant has not been under a disability, as defined in the Social Security Act, since April 9, 2015, the date the application was filed.  Tr. 53.

## V. Plaintiff's Arguments

Valentine alleges three errors in the ALJ's RFC assessment: failure to determine that Valentine required the use of a cane; failure to evaluate his need to elevate his legs; and determination that he was limited to superficial interaction with others.  Doc. 13, p. 2.

## VI. Law & Analysis

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028,

1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681

(6th Cir. 1989) (per curiam) (citations omitted)).  A court "may not try the case *de novo*, nor

resolve conflicts in evidence, nor decide questions of credibility."  *Garner v. Heckler*, 745 F.2d

383, 387 (6th Cir. 1984).

### A. The ALJ did not err with respect to Valentine's use of a cane

Valentine argues that the ALJ's determination that he did not require the use of a cane

was not supported by substantial evidence.  Doc. 13, p. 15.  "[T]he Sixth Circuit has held that if a

cane is not a necessary device for the claimant's use, it cannot be considered a restriction or

limitation on the plaintiff's ability to work."  *Murphy v. Astrue*, 2013 WL 829316, at *10

(M.D.Tenn. March 6, 2013) (citing *Carreon v. Massanari*, 51 Fed. App'x 571, 575 (6th Cir.

2002)); *Cruz-Ridol Carreon v. Comm'r of Soc. Sec.*, 2018 WL 1136119, at *15 (N.D.Ohio Feb.

12, 2018), *report and recommendation adopted*, 2018 WL 1083252.  To be considered a

restriction or limitation, a cane "must be so necessary that it would trigger an obligation on the

part of the Agency to conclude that the cane is medically necessary," *i.e.*, the record must reflect

"more than just a subjective desire on the part of the plaintiff as to the use of a cane."  *Murphy*,

2013 WL 829316, at *10 (internal citations omitted).  "If the ALJ does not find that such device

would be medically necessary, then the ALJ is not required to pose a hypothetical to the VE."

*Id*.  Generally, an ALJ's finding that a cane or other assistive device is not medically necessary is

error when the claimant has been prescribed an assistive device and the ALJ did not include the

use of the device in the RFC assessment without providing an explanation for the omission.

*Cruz-Ridolfi*, 2018 WL 1136119, at *15 (quoting *Watkins v. Comm'r of Soc. Sec.*, 2017 WL

6419350, at *11 (N.D. Ohio Nov. 22, 2017), *report and recommendation adopted*, 2017 WL

6389607).

Here, the ALJ did not impose a limitation that Valentine required the use of a cane in her RFC "because cumulatively, the evidence did not support the medical necessity for a cane."  Tr. 52.  Elsewhere in her decision, the ALJ detailed the evidence with respect to Valentine's use of a cane in the record.  Tr. 45, 46, 49, 50.  In support of her RFC assessment, the ALJ commented that recent exam notes showed that Valentine had a normal gait and explained that Valentine has had conservative treatment for his physical impairments.  Tr. 51.  In other words, the ALJ found that a cane was not medically necessary and explained why she did not include the use of a cane in her RFC assessment.  *Cruz-Ridolfi*, 2018 WL 1136119, at *15.

Valentine does not dispute the ALJ's finding that he had conservative (or no) treatment for his physical impairments and that recent exam findings showed he had a normal gait.

Valentine argues that the ALJ erred because she failed to consider "treating source" Dr. Bell's opinion that he needed a cane.  Tr. 13, p. 15.  As an initial matter, any suggestion that Dr. Bell's opinion is a treating source opinion entitled to deferential weight under the treating physician rule is without merit because Valentine does not meet his burden to show that he had a treating relationship with Dr. Bell.  In fact, it appears that Dr. Bell provided Valentine with work restrictions and a cane the first time he saw him, on August 1, 2013.[2]  Tr. 361, 371.  *See Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. App'x 496, 507 (6th Cir. 2006) ("The treating physician doctrine is based on the assumption that a medical professional who has dealt with a claimant and his maladies over a long period of time will have a deeper insight into the medical condition of the claimant than will a person who has examined a claimant but once," and the claimant has the burden of showing that a doctor is a treating physician) (quoting *Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994)); *Yamin v. Comm'r of Soc. Sec.*, 67 Fed. App'x 883,

---

[2]  A physician whose signature is illegible and different from Dr. Bell's signature ordered an x-ray for Valentine's left knee on July 2, 2013, based on Valentine's complaints of left knee pain.  Tr. 363.

884 (6th Cir. 2003) (two visits to a physician for leg pain did not provide physician with a "long

term overview" of the claimant's condition).[3]

Next, Valentine's statement that the ALJ did not "consider or address Dr. Bell's opinion"

(Doc. 13, p. 16) is baseless because the ALJ did consider Dr. Bell's opinion.  Tr. 49.  The fact

that she did not refer to Dr. Bell by name is not error.

Valentine asserts that the ALJ violated SSR 96-8p, which provides, "If the RFC

assessment conflicts with an opinion from a medical source, the adjudicator must explain why

the opinion was not adopted."  1996 WL 374184, at *7; Doc. 13, p. 16.  He claims that the ALJ

did not provide an explanation as to why she did not adopt Dr. Bell's opinion, which conflicted

with the RFC.  Doc 13, p. 16.  The undersigned disagrees.  In her decision, the ALJ stated that

she gave "little" weight to Dr. Bell's opinion that Valentine could not stand for longer than 5-10

minutes, must have a low bunk, and could lift no more than 10 pounds.  Tr. 49.  She explained

her reasons for doing so: because Dr. Bell did not document examination findings to support the

limitations; the limitations were not imposed for work purposes; and the limitations are not

consistent with other record evidence, most notably subsequently obtained evidence.  Tr. 49.

Valentine complains that the ALJ did not explain the weight she gave to Dr. Bell's

opinion that Valentine needed a cane.  Doc. 13, p. 16.  But, as detailed above, the ALJ explained

why she did not include the use of a cane in her RFC assessment.  Tr. 52.  She also cited the fact

that x-rays of Valentine's left knee showed a narrowing of the femoral patellar and medial

femorotibial compartments but no soft tissue swelling or calcifications.  Tr. 52.  Elsewhere in her

opinion, the ALJ observed the following: Valentine was issued a cane and knee brace while in

---

[3]  Moreover, any relationship Valentine may have had with Dr. Bell after Dr. Bell rendered his opinion does not create a treating relationship at the time of Dr. Bell's opinion.  *See Kornecky*, 167 F. App'x at 506 n.10 (visits to a physician after the physician renders her opinion do not retroactively create an ongoing treating relationship).

prison in September 2013[4] and contemporaneous treatment notes show he had very prominent

varicosities and left knee joint space loss.  Tr. 46.  He saw a physician upon his release from

prison in 2015; imaging detailed varicose veins, no DVT, and he was prescribed compression

hose to wear "all the time" and daily walking; told to avoid prolonged standing; and advised to

elevate his legs.  Tr. 46.  In June 2016 he presented to the emergency room (after an apparent one

year gap in medical treatment) stating that he did not have a primary care physician for

maintenance and medications; he was not noted to be at risk for falls and left knee imaging

showed degenerative changes.  Tr. 46.  In February 2017 (the next treatment note) he was treated

for shingles at the emergency room and had a normal gait, a normal range of motion, and the

record did not mention cane use.  Tr. 46, 50.

    The ALJ observed that, when Valentine saw Dr. Marinello for a consultative exam in

2015, he presented with a slow and unsteady gait and had a cane "and would not walk around the

exam room without it."  Tr. 49.  However, he could rise from a sitting position without assistance

and had no difficulty getting up and down from the exam table.  Tr. 49.  He could squat and rise

with moderate difficulty.  Tr. 49.  He had tenderness and limited range of motion in his left knee.

Tr. 49.  Dr. Marinello opined that Valentine's condition was "relatively stable" and "potentially

treatable."  Tr. 49.  He further opined that Valentine could sit and stand normally in an 8-hour

workday and had "moderate" limitations due to knee pain and needed a cane when walking short

and long distances and on uneven terrain.  Tr. 49.  Valentine does not challenge the ALJ's

treatment of Dr. Marinello's opinion in his opening brief, and only perfunctorily challenges Dr.

Marinello's opinion in his reply.  Doc. 17, p. 4.  Accordingly, any challenge to the ALJ's

---

[4] Actually, prison medical records show that Valentine used a cane and a knee brace prior to his arrival in prison and he testified that he has used a cane since 2009.  Tr. 68; 380 ("Used brace and cane until arrival in prison."). Valentine had a prior disability application, which was denied and became final on January 4, 2013.  Tr. 40, 129-130.

treatment of Marinello's opinion is waived.  *See McPherson v. Kelsey*, 125 F.3d 989, 995–996 (6th Cir. 1997) ("Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.  It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to...put flesh on its bones.") (internal citations omitted); *Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546, 553 (6th Cir. 2008) (issues raised for the first time in a reply brief are waived).  Moreover, Dr. Marinello based his opinion regarding cane use on Valentine's knee pain; Valentine concedes that x-rays of his left knee, alone, do not support a need for a cane.  Doc. 13, p. 17.

Notably, the ALJ stated that she considered the fact that Valentine received only conservative treatment, a finding that is undisputed and supported by the record.  Tr. 51.  She also commented that the state agency reviewing physicians noted that Dr. Marinello indicated cane use but they both found that more recent office visits did not show cane use, there was no other evidence in the record indicating that it was required, and they did not find that a cane was medically necessary.  Tr. 51, 52.  In other words, the ALJ explained why she did not include the need for a cane in Valentine's RFC, in compliance with SSR 96-8p.  *See also Cruz-Ridolfi*, 2018 WL 1136119, at *15 (although there was evidence that supported cane use, the ALJ did not err because there was contrary evidence relied on by the ALJ, such as treatment notes showing a normal gait after the claimant had been prescribed a cane).

Valentine contends that a note from a recent office visit relied upon by the state agency reviewing physicians showing a normal gait "may" have been a urology department visit "that had nothing to [do] with his lower extremities."  Doc. 13, p. 16 (citing Tr. 466).  However, it appears that Valentine's visit with his urologist was related to his "lower extremities"; he was

diagnosed with varicocele, which is, essentially, varicose veins in one's scrotum.[5]  In any event, the reason for Valentine's visit to the urologist does not change the fact that he ambulated with a normal gait and did not use a cane at that visit.  Valentine also complains that the state agency reviewing physicians did not reference Dr. Bell's opinion, and their opinions lacked specificity and were not based on the record as a whole.  Doc. 13, p. 17.  He does not allege that the physicians were missing record evidence.  The fact that the physicians did not cite to Dr. Bell's note saying that Valentine needed a cane does not mean that they did not consider the evidence or that their opinions were riddled with error such that the ALJ, in turn, erred when relying on those opinions.

In further support of his need for a cane, Valentine asserts that he has significant varicose veins (Doc. 13, p. 17), but the diagnosis of this condition does not automatically create the need for a cane.  He alleges that the ALJ erred because she did not take into account Valentine's obesity when evaluating his need for a cane.  Doc. 13, p. 17.  He cites no evidence wherein a provider indicated that his obesity required him to use a cane.  *See Essary v. Comm'r of Soc. Sec.*, 114 Fed. App'x 662, 667 (6th Cir. 2004) ("The absence of further elaboration on the issue of obesity likely stems from the fact that Essary failed to present evidence of any functional limitations resulting specifically from her obesity[,]" citing *Forte v. Barnhart*, 377 F.3d 892, 896 (8th Cir. 2004)).

Finally, even if the ALJ had included the use of a cane to walk even short distances and on uneven terrain in her RFC (the only specific limitation regarding cane use in the record, based on Dr. Marinello's opinion), the VE testified that an individual with the ALJ's assessed RFC who needed a cane to walk more than five feet and on uneven terrain could still perform the jobs

---

[5] *See* Dorland's Illustrated Medical Dictionary, 32nd Edition, 2012, at 2025.

the VE identified and that the ALJ relied upon—packer, garment sorter, and mail room clerk. Tr. 87-88, 52-53.  Thus, any purported error would be harmless.  Valentine's assertion that the VE testified that there would be no jobs an individual with the ALJ's assessed RFC could perform if that person needed a cane for *all* walking and standing (Doc. 13, p. 18, Tr. 94-95) is baseless because there is no evidence in the record that Valentine needed a cane for all walking and standing.

The ALJ did not err with respect to Valentine's use of a cane.

**B. The ALJ did not err with respect to Valentine's need to elevate his legs**

Valentine argues that the ALJ failed to evaluate his need to elevate his legs, as opined by his treating physician, Dr. Addasi, and that, accordingly, the ALJ's RFC is not supported by substantial evidence.  Doc. 13, p. 18.  He asserts that the ALJ did not mention Dr. Addasi or his medical opinion.  Doc. 13, p. 19.  This is incorrect.  Although the ALJ did not mention Dr. Addasi by name, she stated that Valentine saw a doctor for varicose veins, who advised that Valentine elevate his legs and avoid prolonged standing.  Tr. 46.  The failure to refer to Dr. Addasi by name is not error.  Moreover, it appears that Valentine saw Dr. Addasi only twice, and the recommendation to elevate his legs occurred at both visits, including the first visit.  Thus, Valentine does not meet his burden to demonstrate that Dr. Addasi is a treating physician whose opinion is due the deference triggered by the treating physician rule.  *Kornecky*, 167 Fed. App'x at 507.

Next is the question concerning whether Dr. Addasi's recommendation that Valentine elevate his legs qualifies as a "medical opinion."  20 C.F.R. § 404.1527(a)(1) provides that medical opinions "are statements... that reflect judgments about the nature and severity" of the claimant's impairments, his "physical or mental restrictions," and what he can still do despite

them.  *See also Sorrell v. Comm'r of Soc. Sec.*, 656 Fed. App'x 162, 170 (6th Cir. 2016) ("the ALJ was not required to include a limitation for elevating legs in the RFC because, although there were some treatment records that mentioned leg elevation as a treatment for edema, no physician indicated that Sorrell's edema caused work-related functional limitations, and no medical expert opined that Sorrell would need to elevate her feet to waist level during the workday or even every day."); *Carpenter v. Berryhill*, 2017 WL 2909413, at *2-3 (E.D.Ky. May 12, 2017) (examining when and whether statements made in treatment notes constitute opinion evidence, discussing cases).  Here, no physician indicated how high or how often Valentine needed to elevate his legs.  Dr. Addasi recommended, in treatment notes from March and June 2015, that Valentine elevate his legs to treat his varicose veins.  Tr. 424 ("elevation, compression, reduce time spent standing up").  Valentine's discharge instructions after an emergency room visit in June 2016 for cellulitis in his right leg advised Valentine to elevate his legs "above the level of your heart when at rest."  Tr. 496.  Neither of these are medical opinions that Valentine's varicose veins caused work-related functional limitations and/or what those limitations are.  *Sorrell*, 656 Fed. App'x at 170.

Valentine's assertion that the VE testified that an individual with Valentine's RFC could not perform the jobs identified by the VE if he had to "sit with his leg elevated for 50% of the time he is sitting" (Doc. 13, p. 20, Tr. 89-90) misses the mark because there is no opinion evidence in the record indicating that Valentine had to elevate his leg 50% of the time he is sitting, as the ALJ observed at the hearing:

> ALJ: I see here it says elevation[,] compression, reduced time spent standing up.  There's no quantification; can you tell me, is there someplace else that actually quantifies it that it's 50 percent of the time when he's sitting and that it's a permanent restriction and so forth?  Do you have anything else to support your statement that he needs to sit with the leg elevated 50 percent of the time?

Atty: Not – I don't have anything that says 50 percent of the time, no.

Tr. 91-92.

The ALJ did not err when she did not include a limitation for elevating legs in the RFC.

**C. The ALJ did not err with respect to Valentine's mental limitations**

Valentine argues that the ALJ's definition of superficial interaction with others—speaking, signaling, asking questions, and serving but no arbitration or conflict resolution—was inadequate because it describes most of the major modes of communication and does not address Valentine's "aggression or his inappropriate behavior."  Doc. 13, p. 20.  He also complains that the ALJ's definition is "ambiguous" and "meaningless" and that "superficial" does not address the quantity of contact, such as occasional or frequent.  Doc. 13, p. 21.

The ALJ's definition of "superficial interaction" is not "ambiguous," i.e., capable of being interpreted more than one way.  It was not "meaningless" because it describes things that Valentine is able to do and not do.  Valentine's assertion that the ALJ's mental limitations in the RFC did not address his aggression and inappropriate behavior fails because the ALJ explained why she did not credit allegations regarding this behavior.  She detailed his visit with Frontline Services for an initial evaluation, wherein the evaluator indicated that Valentine seemed rehearsed and dramatic; he was assessed a GAF score of 65,[6] indicating mild symptoms; his medications helped; he had regular, close contact with multiple family members and he had a girlfriend; he worked and had normal attendance; he used public transportation; he went on weekend trips with his boss; and he was regularly found upon exam to be calm, cooperative,

---

[6] GAF (Global Assessment of Functioning) considers psychological, social and occupational functioning on a hypothetical continuum of mental health illnesses.  *See* American Psychiatric Association: Diagnostic & Statistical Manual of Mental Health Disorders, Fourth Edition, Text Revision.  Washington, DC, American Psychiatric Association, 2000 ("DSM-IV-TR"), at 34.  A GAF score between 61 and 70 indicates "some mild symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships."  *Id.*

pleasant, and having good eye contact.  Tr. 43, 47-48.  The ALJ explained that he gave only "partial" weight to consultative examiner Dr. Wax's opinion that Valentine would not respond appropriately to others in a work setting because Dr. Wax relied extensively on Valentine's self-reports and did not include precise limitations.  Tr. 50-51.  Valentine does not challenge the ALJ's assessment of Dr. Wax's opinion.

Valentine does not indicate what precise limitations he believes should have been included in the RFC.  His argument is, at base, a disagreement with the ALJ's determination of his mental limitations, rather than a disagreement with the way the ALJ defined "superficial." The ALJ's assessed mental limitations are supported by the record and the ALJ did not err in limiting Valentine to superficial interaction with others.

### VII. Conclusion

For the reasons set forth herein, the undersigned recommends that the Commissioner's decision be **AFFIRMED**.


Dated: July 23, 2019

/s/ Kathleen B. Burke
_____
Kathleen B. Burke
United States Magistrate Judge


### OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). *See also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).